Thomas A. Myers (State Bar No. 176008)
Jonathan M. Eisenberg (State Bar No. 184162)
Liza M. Brereton (State Bar No. 261380)
Courtney N. Conner (State Bar No. 279062)
AIDS HEALTHCARE FOUNDATION
6255 West Sunset Boulevard, 21st Floor
Los Angeles, CA 90028-7422
Telephone: (323) 860-5361
Facsimile: (323) 467-8450
Email: jonathan.eisenberg@ahf.org

Attorneys for Plaintiff
AIDS HEALTHCARE FOUNDATION

UNITED STATES DISTRICT COURT,

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AIDS HEALTHCARE FOUNDATION, a California non-profit public-benefit corporation, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| PRIME THERAPEUTICS LLC, a Delaware limited-liability company, | |
| Defendant. | |

- 1 -

COMPLAINT

**INTRODUCTION**

1.    "No antitrust violation is more abominated than the agreement to fix prices." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1144 (9th Cir. 2003). Hence "no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940).  Price-fixing is a per se violation of not only federal law but also California's Cartwright Act. *Mailand v. Burckle*, 20 Cal.3d 367, 377; 572 P.2d 1142, 1147; 143 Cal. Rptr. 1, 6 (1978).  Nonetheless, Defendant Prime Therapeutics LLC ("Prime") has openly engaged, with a direct business competitor, in fixing prices for prescription-drug payments to pharmacies, including the multiple pharmacies of Plaintiff AIDS Healthcare Foundation ("AHF"). By lowering those payments to match the rates of the competitor, and to stay matched over time, Prime has seized a large sum of money for itself  –  and has cheated AHF out of money earned. Therefore, AHF brings this civil action (1) to stop Prime from continuing to violate "the most settled principle of antitrust law" by horizontally fixing prices (John J. Miles, *Health Care and Antitrust Law*, § 3:2 (Apr. 2021 Update)), and (2) to obtain compensation from Prime for the damages that AHF has suffered because of this unlawful scheme.

**PARTIES**

2.    Plaintiff AHF is a California non-profit public-benefit corporation incorporated in 1987 and headquartered in Los Angeles, California. AHF provides cutting-edge medical care, including pharmacy services, to people affected by Human Immunodeficiency Virus ("HIV") or living with Acquired Immune Deficiency Syndrome ("AIDS"), regardless of ability to pay.  AHF provides this care to people in Los Angeles, throughout California, and across the country.  AHF is the largest private-sector provider of HIV/AIDS medical care to people in the United States. AHF owns and operates nine pharmacies in the County

- 2 -

of Los Angeles, California; a total of 15 pharmacies throughout California, and a total of 63 pharmacies across the United States.

3.     AHF is informed and believes and, based thereon, alleges as follows: Defendant Prime is a Delaware limited-liability company formed in 1998 and headquartered in Eagan, Minnesota. Prime is a pharmacy benefits manager ("PBM").[1] Prime is jointly owned by 19 Blue Cross and/or Blue Shield health-insurance plans, or their subsidiaries or affiliates. Through relationships with those entities, as well as with employers and government programs, Prime manages pharmacy benefits for approximately 33 million people across the country, including in California, and interacts with numerous pharmacies, including California pharmacies. (See, e.g., Prime, *Prime Therapeutics – Privacy Notice for California Customers* (Jan. 1, 2021), available online at https://www.primetherapeutics.com/en/privacy-policy-california-residents.html (last visited May 25, 2021; print-out attached as Exhibit 1); Prime, *CCPA Personal Information Request Form* (giving California residents notice of rights under California privacy law), available online at https://www.primetherapeutics.com/en/privacy-policy-california-residents/ccpa-form.html (last visited May 25, 2021; print-out attached as Exhibit 2); Prime, *Prime Therapeutics Provider Manual for Pharmacy Providers* (2001) at 6 ("Notice to California Pharmacies," available at https://www.primetherapeutics.com/content/dam/corporate/Documents/Resources/Pharmacists/PharmacyProviderResources/ProviderManual/document-primeprovidermanual-Apr2021.pdf (last visited May 25, 2021; print-out attached as Exhibit 3).)

---

[1] "Pharmacy benefit managers (PBMs) are a little-known but important part of the process by which many Americans get their prescription drugs. Generally speaking, PBMs serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use. When a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription, the pharmacy checks with a PBM to determine that person's coverage and copayment information. After the beneficiary leaves with his or her prescription, the PBM reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment. The prescription-drug plan, in turn, reimburses the PBM." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S. Ct. 474, 478 (2020).

**SUBJECT-MATTER JURISDICTION**

4.      This Court has federal-question jurisdiction over this civil action's subject matter, because it arises, in part, under the laws of the United States. 28 U.S.C. § 1331. This Court also has federal-question jurisdiction over this civil action's subject matter, because this Court is invested with jurisdiction to prevent and to restrain violations of the federal Sherman Act (15 U.S.C. §§ 4, 25), and because AHF's business has been injured, because of Prime, by reason of something forbidden by the federal antitrust laws (15 U.S.C. § 15).

5.      This Court also has diversity-of-citizenship jurisdiction over this civil action's subject matter, because the amount of money in controversy exceeds $75,000, exclusive of interest and costs, and AHF and Prime are citizens of different U.S. states. 28 U.S.C. § 1332.

6.      This Court also has supplemental jurisdiction over that part of this civil action's subject matter that arises under California law, because that part is so related to the claims under federal law as to form part of the same case or controversy under Article III of the U.S. Constitution. 28 U.S.C. § 1367.

**VENUE**

7.      This judicial district, the Central District of California, is the proper venue for this civil action, because (a) Prime resides, is found, and conducts business within this judicial district; (b) Prime is subject to personal jurisdiction within this judicial district with respect to this civil action; and/or (c) a substantial part of the events or omissions giving rise to the claim occurred here. 28 U.S.C. § 1391; 15 U.S.C. §§ 15, 22; cf. Cal. Bus. & Prof. Code § 16750.

8.      Among the four judicial districts in California, this judicial district is the proper venue for this civil action, because Prime's contacts with the judicial district are sufficient to subject Prime to personal jurisdiction herein. 28 U.S.C. § 1391.

COMPLAINT

## STATEMENT OF FACTS

9.     On or around December 19, 2019, Prime issued a press release announcing "a new three-year collaboration" with Express Scripts, Inc. ("ESI"), supposedly "designed to deliver more affordable care for clients and their members by enhancing pharmacy networks and pharmaceutical manufacturer value." (Prime, *Express Scripts and Prime Therapeutics Collaborate to Deliver More Affordable Care to More Than 100 Million Americans* (Dec. 19, 2019), available online at https://www.primetherapeutics.com/en/news/pressreleases/2019/release-prime-express-scripts-collaboration.html (last visited May 25, 2021; print-out attached as Exhibit 4).)

10.    AHF is informed and believes, based on the February 25, 2021, U.S. Securities and Exchange Commission 10-K report of Cigna Corp. ("Cigna"), that Cigna is a Delaware corporation with publicly traded stock; and that Cigna has a subsidiary, Express Scripts Holding Company, which includes ESI and Express Scripts PBM ("ESPBM"), a PBM. In the 10-K, Cigna expressly described Prime as a competitor PBM of ESPBM, and Prime and ESPBM are, indeed, directly competing PBMs.

11.    In the 10-K, Cigna has acknowledged the Prime-ESI collaboration as follows: "In 2019, Express Scripts and Prime Therapeutics LLC ('Prime') entered into an agreement effective on April 1, 2020 which is delivering improved choice and affordability for Prime's clients and their patients by enhancing retail pharmacy networks and pharmaceutical manufacturer value."

12.    The Prime-ESI collaboration concerns agreements between Prime and pharmacies, by which Prime processes pharmacies' requests for reimbursements for filling prescriptions of and/or providing health care to customers whose PBM is Prime.

13.    Prime processes numerous AHF requests for reimbursements for filling prescriptions of and/or providing health care to customers whose PBM is Prime. In 2020, Prime processed nearly 100,000 prescription-reimbursement requests from AHF.

14.    On or around January 2, 2020, Prime sent out a mass mailing stating, in part, that "Prime's health plans will begin to transition to ESI's commercial and Medicaid pharmacy networks starting April 1, 2020. [...]Prime will continue to operate our claims processing platform, as well as manage and deliver a wide range of services to our clients and their members, including pharmacy network management, formulary management and clinical programs." (See print-out attached as Exhibit 5.)

15.    In the United States, "the pharmacy industry utilizes two unique identifiers to identify entities responsible for administering claims in retail pharmacy transactions, the Bank Identification Number/Issue Identification Number (BIN/IIN) [also sometimes referred to as just "BIN"] and the Processor Control Number (PCN). These identifiers are programmed into the pharmacy's software and identify the route for processing the transaction from the pharmacy to the entity responsible for administering the claim, which could be the health plan or the pharmacy benefit manager. [...]The BIN/IIN is a 6-digit number [...] for use by retail pharmacies to route prescription drug claims to the entity responsible for processing the transaction, usually the pharmacy benefit manager.  The PCN is an identifier of up to 10 characters that is assigned by pharmacy benefit claim processors if there is a need to further define benefits and routing. [...]The BIN/IIN and PCN identifiers are included in information from pharmacy benefit managers and/or health plans that are distributed to pharmacies to provide details on who will be processing the transaction, where to route the transaction and what rules are expected to be applied during transaction processing." *Administrative Simplification:  Adoption of a Standard for a Unique Health Plan Identifier [Etc.]*, 77 Fed. Reg. 54664, 54677-78 (Sept. 5, 2012).  AHF usually obtains BIN and PCN identifiers from health-insurance cards or paperwork supplied by patients.

16.    AHF's pharmacies utilize BIN and PCN identifiers as indicated above, for transaction processing.  In addition, AHF's pharmacies sometimes use third-level identifiers, known as "Group Numbers," associated with specific employer-provided

- 6 -

1  health-insurance plans.  Again, AHF usually obtains Group Numbers from patients'

2  health-insurance cards or paperwork.

3      17.    Prime has established codes, called "NRIDs," that are associated with

4  particular reimbursement rates to pharmacies for providing pharmacy services.  Prior

5  to April 2020, when pharmacies including AHF supplied BIN, PCN, and/or Group

6  Number identifiers to Prime, in the course of seeking reimbursement for services

7  provided to patients whose PBM was Prime, Prime used those identifiers to select

8  specific associated NRIDs.  Prime reimbursement amounts were determined based – in

9  whole – on what the associated NRIDs were.

10     18.    Prior to April 2020, Prime's prices at which pharmacies were reimbursed

11 for various services rendered differed from, and were often higher than, ESPBM's

12 prices at which pharmacies were reimbursed for the same services rendered.

13     19.    In or around April 2020, Prime released a crosswalk table informing

14 pharmacies submitting requests for reimbursements in approximately 15 different

15 categories – associated with commercial, exchange, and U.S. state health-insurance

16 plans – that Prime was no longer going to have its own reimbursement rates associated

17 with NRIDs.  Instead, Prime was going to starting associating its NRIDs with certain

18 schedules in ESI contracts, which schedules contain ESPBM reimbursement rates.

19 Although the table is labeled "confidential," Prime has published the table online at

20 www.primetherapeutics.com, where the table is freely available to anyone who has

21 Internet access and a working web browser.  (See

22 https://www.primetherapeutics.com/content/dam/corporate/Documents/Resources/Phar

23 macists/processingresources/Reimbursement/document-network-identifiers-april.pdf

24 (last visited May 25, 2021; print-out attached as Exhibit 6).)  Prime followed through

25 on the notice and has been making pharmacies seeking reimbursements from Prime

26 take reimbursement at ESPBM's rates, not Prime's rates.  In other words, Prime fixed

27 its prices to ESPBM's prices, on an ongoing basis.

28

COMPLAINT

20.     Since April 2020, in those 15 categories, for providing health care in the nature of pharmacy services to patients whose PBM is Prime, AHF has been receiving reimbursements from Prime that are at ESPBM's rates.  AHF has receiving smaller payments from Prime than AHF was receiving before, for the same services rendered.

21.     On or around November 13, 2020, Prime sent out another mass mailing stating, in part, that "ESI's Medicare network options are now available to Prime's Benefit Sponsors, and they have the choice to determine which pharmacy network(s) they will use to administer benefit plans." (See print-out attached as Exhibit 7.)  The choices would be implemented "starting January 1, 2021. ...While ESI networks are contracted and managed by ESI, Prime will remain the claims processor for our Benefit Sponsors." (AHF is informed and believes that all Prime Benefit Sponsors chose ESI's Medicare network options.)  The mailing included two more crosswalk tables.  The first one indicated that approximately 80 Medicare health-insurance plans, whose PBMs are Prime, would have NRIDs become associated with certain schedules in ESI contracts, which schedules, again, contain ESPBM reimbursement rates.  The second table identified 13 categories, all associated with Medicare health-insurance plans, that also would have NRIDs become associated with certain schedules in ESI contracts.  Prime followed through on the notice and has been making pharmacies seeking reimbursements from Prime take reimbursement at ESPBM's rates, not Prime's rates.  In other words, Prime further fixed its prices to ESPBM's prices, on an ongoing basis.

22.     Since January 2021, in those many categories, for providing health care in the nature of pharmacy services to patients whose PBM is Prime, AHF has been receiving reimbursements from Prime that are at ESPBM's rates.  AHF has received smaller payments from Prime than AHF was receiving before, for the same services rendered.

23.     The Prime-ESI collaboration is about price-fixing, not combining complementary assets or capabilities of Prime and ESI.  The Prime-ESI collaboration

1   is not facilitating the offering of any new product or service.  Prime and ESI still

2   operate as separate, competing PBMs in most respects:  enrollment and member

3   services for plan beneficiaries; drug formulary development; formulary and rebate

4   negotiations with manufacturers of drugs; custom network options; and value-

5   based care strategies and contracting.  Indeed, in a January 7, 2020, media

6   interview, Jarrod Henshaw, then Prime's Senior Vice President and Chief Supply

7   Chain and Industry Relations Officer, stressed that Prime would not automatically

8   adopt ESPBM's drug formularies or pharmacy networks.  (See Adam J. Fein,

9   "Express Scripts + Prime Therapeutics:  Our Four Takeaways From This Market

10   Changing Deal," *Drug Channels* (Jan. 7, 2020), available online at

11   https://www.drugchannels.net/2020/01/express-scripts-prime-therapeutics-our.html

12   (last visited May 25, 2021; print-out attached as Exhibit 8).)

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

FEDERAL HORIZONTAL PRICE-FIXING

(15 U.S.C. §§ 1, 15, 26)

17      24.    AHF incorporates by this reference, as if set forth fully herein, all the

18   preceding allegations in the preceding paragraphs.

19      25.    Prime and ESPBM, both PBMs, are direct business competitors, engaged

20   in interstate commerce.

21      26.    Prime and ESI knowingly and voluntarily entered into the Prime-ESI

22   collaboration.

23      27.    Before the Prime-ESI collaboration, Prime and ESPBM independently set

24   and paid different prices to pharmacies for rendering the same services.  The Prime-ESI

25   collaboration functions to fix, to set, to lower, to raise, to maintain, and/or to stabilize

26   the previously different prices that Prime and ESPBM set and pay to pharmacies for

27   rendering the same services.

28      28.    The Prime-ESI collaboration affects interstate commerce.

29.    Horizontal price-fixing, which the Prime-ESI collaboration perpetrates, is a per se unreasonable restraint of trade under the federal Sherman Act, 15 U.S.C. § 1.

30.    The Prime-ESI collaboration, by horizontally fixing prices for pharmacy services, including by lowering the amounts of the Prime reimbursements to AHF, has financially harmed AHF in its pharmacy enterprise, as well as in AHF's ability to fulfill its mission of providing cutting-edge medical care to people with HIV/AIDS, regardless of ability to pay.

SECOND CAUSE OF ACTION

CALIFORNIA HORIZONTAL PRICE-FIXING

(CAL. BUS. & PROF. CODE §§ 16720, 16722, 16726, 16750)

31.    AHF incorporates by this reference, as if set forth fully herein, all the preceding allegations in the preceding paragraphs.

32.    Prime and ESPBM, both PBMs, are direct business competitors.

33.    Prime and ESI knowingly and voluntarily entered into the Prime-ESI collaboration.

34.    Before the Prime-ESI collaboration, Prime and ESPBM independently set and paid different prices to pharmacies for rendering the same services. The Prime-ESI collaboration functions to fix, to set, to lower, to raise, to maintain, and/or to stabilize the previously different prices that Prime and ESPBM set and pay to pharmacies for rendering the same services.

35.    Horizontal price-fixing, which the Prime-ESI collaboration perpetrates, is a per se unreasonable restraint of trade under California's Cartwright Act, California Business and Professions Code section 16720.

36.    The Prime-ESI collaboration, by horizontally fixing prices for pharmacy services, has financially harmed AHF in its pharmacy enterprise, as well as in AHF's ability to fulfill its mission of providing cutting-edge medical care to people with HIV/AIDS, regardless of ability to pay.

37.    Prime's conduct was a substantial factor in causing AHF's harm.

THIRD CAUSE OF ACTION

CALIFORNIA UNFAIR COMPETITION

(CAL. BUS. & PROF. CODE §§ 17200, 17203)

38.    AHF incorporates by this reference, as if set forth fully herein, all the preceding allegations in the preceding paragraphs.

39.    The Prime-ESI collaboration is a business act or practice.

40.    The Prime-ESI collaboration is unlawful and/or unfair, violative of federal antitrust law and California antitrust law.

**PRAYER FOR RELIEF**

Wherefore, AHF prays for relief as follows:

1.    On the First Cause of Action for Federal Horizontal Price-Fixing:

    a.    For three times the damages that AHF has sustained by reason of Prime's violations of the federal antitrust laws;

    b.    For costs of suit, including reasonable attorneys' fees;

    c.    For simple interest on actual damages from the date that AHF serves this Complaint on Prime;

    d.    For an injunction against threatened or future loss or damage to AHF by reason of Prime's violations of the federal antitrust laws.

2.    On the Second Cause of Action for California Horizontal Price-Fixing:

    a.    For three times the damages that AHF has sustained by reason of Prime's violations of California's antitrust laws;

    b.    For costs of suit, including reasonable attorneys' fees;

    c.    For 10 percent annual interest on actual damages from the date that AHF serves this Complaint on Prime;

    d.    For an injunction against threatened or future loss or damage to AHF by reason of Prime's violations of the California antitrust laws.

3.    On the Third Cause of Action for California Unfair Competition:

1         a.     For an injunction to prevent the use of the Prime-ESI collaboration,

2 or any similar act or practice, to commit unfair competition.

3         b.     For restitution to AHF of money that Prime acquired from AHF by

4 means of the unfair competition.

5     For all causes of action, for other and further relief that the Court deems just and

6 proper.

7 **DEMAND FOR JURY TRIAL**

8     AHF demands a trial by jury of the first and second causes of action herein.

9

10

11 DATED: June 18, 2021         By: *Jonathan M. Eisenberg*

12                         Tom Meyers

Jonathan M. Eisenberg

13                         Liza M. Brereton

Courtney N. Conner

14                 Attorneys for Plaintiff

AIDS HEALTHCARE FOUNDATION

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 12 -

EXHIBIT 1





ABOUT ⌄    OUR BUSINESS ⌄    RESOURCES ⌄    NEWSROOM    CAREERS    CONTACT    MEMBER SIGN-IN

## Prime Therapeutics – Privacy Notice for California Residents

Last updated: January 1, 2021

Prime Therapeutics LLC ("Prime," "we," or "us") understands the importance of your privacy and takes our responsibility to protect your information seriously. To that end, this privacy notice (the "Notice") provides information regarding the categories of information we collect from California residents, how we use and share that information, and certain rights and obligations relating to that information, as required by the California Consumer Privacy Act of 2018 (the "CCPA"). This Notice applies to the personal information we collect from California residents that use our websites—primetherapeutics.com and myprime.com—including applicants for job openings with Prime.

Please note that this Notice is a supplement to our Privacy Policy, which can be viewed here. We encourage you to review our Privacy Policy.

**Personal Information We Collect and How We Collect It**

As defined by the CCPA, "personal information" includes any information that identifies, relates to, describes, references, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular California resident or device. Personal Information does not include HIPAA-protected health and patient information that Prime Therapeutics may receive as a business associate, as that information is excluded from the requirements of the CCPA. It also does not include publicly available information from government records or information that has been de-identified or aggregated.

In the past 12 months, we have collected the following categories of personal information from California residents through our websites and from job applicants.

| Category | Examples | Do We Collect? |
|---|---|---|
| Legally protected classification characteristics | Race, color, national origin, citizenship, marital status, sex, age (40 years or older), gender, military status, medical condition, pregnancy, physical or mental disability | Yes, but only for job applicants. |
| Personal information categories in California's Consumer Records statute | Name, social security number, physical characteristics, address, telephone number, education, employment, employment history, signature | Yes, but only for job applicants. |
| Identifiers | Name, alias, postal address, unique personal identifiers, IP address, other online identifier, email address, social security number, | Yes; SSNs are only collected from job applicants |
| Internet or similar network activity | Information relating to your interaction with our website or applications, browsing history, search history | Yes |
| Commercial information | Purchasing or consuming histories, records of personal property, products and services purchased | No |
| Geolocation information | Information regarding physical location, movement, and movement patterns | No |
| Biometric information | Physiological, biological, or behavioral characteristics, such as DNA sequence, finger prints, iris or retina scans, voice recordings, keystroke rhythm or gait, face or palm patterns, vein patterns, and sleep, health, or exercise data that contain identifying information | No |
| Sensory information | Audio, electronic, visual, thermal, or similar information | No |
| Professional or employment-related information | Prior employment history, performance information, resume or similar information | Yes, but only for job applicants |
| Non-public education information | Education records directly related to a student that are maintained by an educational institution pursuant to the Family Educational Rights and Privacy Act, | Yes, but only for job applicants |
| Inferences from other personal information | Inferences drawn from the categories listed above to create a profile about an individual that reflects the individual's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, or aptitudes | No |

EXHIBIT 1

We collect the information above directly from job applicants when they choose to provide it to us in connection with the application for a job and when if they create an online careers account with us. We collect the information above directly from website users when they choose to provide it to us by filling out forms on our website and registering to receive emails or information from us. We also collect certain categories of information from website users indirectly—including identifiers (such as IP addresses), information describing your internet connection, information about the equipment you use to access our website, and website usage data—when they visit, use, and navigate across our website. We do so by using the following technologies:

- Cookies (or browser cookies). A cookie is a small file placed on the hard drive of your computer. You may refuse to accept browser cookies through your browser settings. If you select this setting you may be unable to access certain parts of our website. Unless you have adjusted your browser setting so that it will refuse cookies, our system will issue cookies when you direct your browser to our website. We may also use a similar technology, which permits us to track browsing activity across our collective websites.
- Flash Cookies. Certain features of our website may use local stored objects (or Flash cookies) to collect and store information about your preferences and navigation to, from and on our website. Flash cookies are not managed by the same browser settings as are used for browser cookies.

**How We Use Your Personal Information**

We use the personal information that you provide us, or that we collect about you, for the following business or commercial purposes:

- To present our website and its contents to you.
- To consider you for current or future employment opportunities and to process your employment application.
- To provide you with information, products or services that you request from us or that we are contracted to provide through your applicable health plan or employer group.
- To fulfill any other purpose for which you provide it, such as subscribing you to an e-mail newsletter.
- To provide you with notices about your account and status.
- To carry out our obligations and enforce our rights arising from any contracts entered into between you and us, including for billing and collection.
- To notify you about changes to our website or any products or services we offer or provide through it.
- To notify you about any of the benefits or services you may be eligible to receive offered through us by your health plan.
- To allow you to participate in interactive features on our website, if any.
- To contact you regarding any of our services you have accessed, whether through our website or otherwise.
- To comply with applicable laws, regulations, and legal process.
- In any other way we may describe when you provide the information.
- To keep a record of our transactions and communications.
- As otherwise necessary or useful for us to conduct our business, provided the use is permitted by law. Specific examples include: Analyzing our audience and use patterns from the websites; storing information about your preferences and allowing us to direct or customize specific content to you; recognizing you when you return to our websites.
- For the protection of our operations or those of any of our affiliates, or to protect our rights, privacy, safety or property, or that of our affiliates, you, or other parties.
- For any other purposes with your consent.

**Disclosure and Sale of Personal Information**

Prime does not share the personal information of website users with third parties, with the exception of certain third parties that provide website and analytics services. Prime shares personal information relating to job applicants as set forth in this Notice or our Privacy Policy. Third parties with whom we may share your information include:

- Governmental agencies, as may be required by law;
- Consumer reporting agencies, as necessary to conduct pre-employment background screening; and
- HRIS vendor and, for job applicants, pre-employment assessment vendors/administrators, including drug and alcohol testing vendors.

During the past 12 months, Prime has disclosed the following categories of personal information relating to job applicants for a business purpose: identifiers, professional and employment-related information, non-public education information, legally protected classification characteristics, and personal information categories as identified in California's Consumer Records statute.  All of these categories have been shared with our HRIS vendor and pre-employment assessment vendors/administrators.  Only identifiers, and personal information categories from California's Consumer Records statutes have been shared with consumer reporting agencies.  No information has been shared with governmental agencies.

Prime has not sold any categories of personal information to third parties in the past 12 months and does not sell personal information of minors under 16 years of age.

Please note that we may also use, disclose, or transfer your information in connection with the sale, merger, dissolution, restructuring, divestiture, or acquisition of our company or its assets. We may also disclose your personal information in response to a court order, subpoena, search warrant, law, or regulation.

**Your Rights Under the CCPA**

The CCPA provides California residents with the rights discussed below. For convenience, and as required by the CCPA, we explain how you can exercise those rights, to the extent they are applicable.

1. **Right to Request Access Information.** You have the right to request that we disclose certain information about our collection and use of your personal information during the past 12 months. Specifically, you may request that we disclose:

o The categories of personal information we collected about you;

o The categories of sources for the personal information we collected about you;

o The business and commercial purposes for collecting your personal information;

o The categories of third parties with whom we shared your personal information;

o The specific pieces of personal information we collected about you; and

o If we disclosed your personal information for a business purpose, the categories of personal information received by each category of third party.

1. **Right to Data Portability.** You have the right to request that we provide copies of the specific pieces of personal information we collected about you. If a verifiable consumer request is made, and subject to any exceptions or limitations under the CCPA, we will take steps to deliver the personal information to you either by mail or electronically. If we provide the information to you electronically, it will be in a portable and readily useable format, to the extent technically feasible.

2. **Right to Request Deletion.** You have the right to request that we delete personal information we collected from you, subject to any exceptions or limitations under the CCPA.

To exercise the rights described above, you—or someone authorized to act on your behalf—must submit a verifiable consumer request to us by filling out and submitting a request form here, Alternatively, you may call us at 888.849.7840 or submit a request via email to Privacy@primetherapeutics.com, Please be prepared to provide the information required in the request form, including your name, phone number, email address, physical address, and the nature of your relationship to Prime. If you are an authorized agent submitting a request on behalf of a consumer, we may request confirmation of your authorization, including a signed permission from the consumer. This information is necessary to reasonably verify that you are the individual regarding whom we collected the personal information or an authorized representative, and to ensure that we can understand and respond to your request. We reserve the right to request additional information as necessary to verify and act upon your request. You may only submit requests for access or data portability twice within any 12-month period. As indicated above, please be aware that the CCPA provides certain limitations and exception to the foregoing rights, which may result in us denying or limiting our response to your request.

The CCPA requires us to respond to a verifiable consumer request within 45 days, but permits us to extend that period by an additional 45 days, provided we notify you of the reason for the extension in writing. We will endeavor to acknowledge our receipt of a consumer request within 10 days and, if applicable, provide information regarding how we will process the request. In general, we will not charge a fee to respond to a verifiable request, unless it is excessive, repetitive, or unfounded.

**Our Commitment Not to Discriminate**

If a California resident exercises the rights discussed above, consistent with the CCPA, we will not discriminate against that resident by denying goods or services, charging different prices or rates for goods or services, providing different levels or quality of goods or services, or suggesting that the resident will receive a different price, rate, or quality of goods or services.

**Changes to this Notice**

Please note that we may change this Notice from time to time. We will post changes here and update the "Last Updated" date at the top of this document. Continued use of this website after any changes is deemed to be acceptance of those changes. Please check this Notice periodically for updates.

**Our Contact Information**

To contact us regarding this Notice, your rights under the CCPA, or to exercise those rights, please contact us using the information below.

Prime Therapeutics LLC
Attn: Privacy Officer
P.O. Box 64812
St. Paul, MN 55164-0802
Telephone: 888.849.7840
Email: Privacy@primetherapeutics.com

Submit a CCPA rights request on an electronic form,

**Contact us**

We're here to help. You can get in touch with us by using our contact form.

© 2021 Prime Therapeutics LLC, All Rights Reserved.

Privacy Policies | Terms of Use | Subrogation services

**More information**

Thought leadership | Controlled substances

**Our other websites**

MyPrime.com

AllianceRx Walgreens Prime

 Linkedin     YouTube     Facebook     Twitter











EXHIBIT 2

5/25/2021
CCPA Form



**ABOUT** ⌄    **OUR BUSINESS** ⌄    **RESOURCES** ⌄    **NEWSROOM**    **CAREERS**    **CONTACT**



## CCPA Personal Information Request Form

The California Consumer Privacy Act (CCPA) gives California residents certain rights regarding their personal information, which are summarized in our Privacy Notice for California Residents. If you are a California resident, or are submitting this request on behalf of a California resident, you can exercise CCPA rights by using this web form to submit your request to us. You can also exercise CCPA rights by calling us, toll-free, at telephone: 888.849.7840 or by submitting an email containing Privacy@PrimeTherapeutics.com containing the information required below.

We will need information requested in this form so we can verify and process your request. We will acknowledge receipt of this request immediately upon successful submission. The receipt will serve as the required 10-day acknowledgement. We will respond to a complete and verifiable webform request within 45 days. The CCPA allows us to extend that period by an additional 45 days, however, provided we notify you of the reason for the extension in writing. We may contact you to request additional information in connection with your request. Please note that the vast majority of personal information we process relates to current or former members of Prime, or health plans, employer group, and administrative service organizations that use Prime for prescription benefit management services.  Such personal information is protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), which falls under a CCPA exemption and will not be in scope for a personal information request.

What is your relationship to Prime Therapeutics?

○ I am a current/former member of the prescription benefits management program

○ I am a website user

○ I am a current/former employee/contractor or job applicant

○ Other. Please explain:

Submit    **Cancel**

**Contact us**

We're here to help. You can get in touch with us by using our contact form.

© 2021 Prime Therapeutics LLC, All Rights Reserved.
Privacy Policies | Terms of Use | Subrogation services

**More information**

Thought leadership | Controlled substances

**Our other websites**

MyPrime.com
AllianceRx Walgreens Prime

 Linkedin     YouTube     Facebook     Twitter

EXHIBIT 2

5/25/2021

CCPA Form



**ACCREDITED**

Pharmacy
Benefit
Management
Expires 01/01/2022









EXHIBIT 3





PRIME THERAPEUTICS
# PROVIDER
# MANUAL
FOR PHARMACY PROVIDERS



EXHIBIT 3

## SECTION 2: COMPLIANCE (CONTINUED)

- › Phishing to identify a drug that is covered (e.g., a Pharmacy submits a claim for one drug, receives a reject or reverses the claim, and resubmits for a new drug within a short period of time)

- › Prescription splitting to bypass Point of Sale (POS) messaging requiring a PA

- › Billing a greater vial size than what is necessary to supply the ordered dose

- › Waiving Copays — The Pharmacy does not collect the copay due from the Covered Person, when required by the Agreement

- › Misrepresenting or falsifying information to obtain a paid claim

- **Prescription drug shorting** — The Pharmacy provides less than the prescribed quantity and intentionally does not inform the Covered Person or make arrangements to provide the balance, but bills for the full amount ordered on the prescription.

- **Bait and switch pricing** — The Pharmacy leads a Covered Person to believe that a drug will cost one price, but at POS, the Covered Person is charged a higher amount.

- **Prescription forging or altering** — Existing prescriptions are altered without the Prescribing Provider's permission to increase the quantity or number of refills.

- **Dispensing expired or adulterated prescription drugs** — The Pharmacy dispenses drugs that are expired or have not been stored or handled according to the manufacturer or FDA requirements.

- **Prescription refill errors** — The Pharmacy provides a higher number of refills than what was prescribed.

- **Illegal remuneration schemes (kickbacks)** — The Pharmacy is offered, solicits, or receives unlawful payment that results in an incentive or reward for switching Covered Persons to different drugs, influencing Prescribing Providers to prescribe different drugs or steering Covered Persons to plans.

- **TrOOP manipulation** — Manipulation of true out-of-pocket (TrOOP) costs by the Pharmacy, including to either push a Covered Person through the coverage gap so the Covered Person can reach catastrophic coverage before being eligible, or to keep a Covered Person in the coverage gap so that catastrophic coverage is never realized.

- **Failure to offer negotiated prices** — The Pharmacy's failure to offer a Covered Person the negotiated price of a drug available to the Covered Person through the Benefit Plan.

- **Inappropriate application of therapeutic interchange protocols** — The Pharmacy dispensing a different covered medication than the prescribed medication without obtaining and documenting the Prescribing Provider's consent prior to dispensing or without informing the Covered Person of the substitution.

## NOTICE TO CALIFORNIA PHARMACIES

This serves as notice to Pharmacies in California about rights under California Health & Safety Code.

**Pharmacy Reporting**

Pharmacies may report to the department through the toll-free Pharmacy line, email address or other method designated by the California Department of Managed Health Care, instances in which the Pharmacy believes a Benefit Sponsor is engaging in an unfair payment pattern. (Cal. Health & Safety Code §1371.39)

**Pharmacy Bill of Rights**

Pharmacy has certain rights as a Pharmacy under Cal. Health & Safety Code §1371.39.

EXHIBIT 4





ABOUT ⌄    OUR BUSINESS ⌄    RESOURCES ⌄    NEWSROOM    CAREERS    CONTACT    MEMBER SIGN-IN

# Press releases

‹ Prime's Newsroom

December 19, 2019

## Express Scripts and Prime Therapeutics Collaborate to Deliver More Affordable Care to More Than 100 Million Americans

**Collaboration leverages scale and capabilities to drive greater value.**

ST. LOUIS, Mo. and EAGAN, Minn., – Leading pharmacy services providers Express Scripts and Prime Therapeutics LLC (Prime) today announced a new three-year collaboration designed to deliver more affordable care for clients and their members by enhancing pharmacy networks and pharmaceutical manufacturer value.

Prime, collectively owned by 18 Blue Cross and Blue Shield Plans, subsidiaries or affiliates, provides total drug management solutions for more than 28 million people covered by 23 health plans, plus employers and government programs including Medicare and Medicaid. Prime will continue to supply full-service pharmacy benefit management offerings for its clients and customers.

Express Scripts serves more than 3,000 clients and 75 million customer relationships. Under this collaboration, Express Scripts will provide services to Prime related to retail pharmacy network and pharmaceutical manufacturer contracts. Both companies will continue to work independently with pharmaceutical manufacturers—Express Scripts handling negotiations for drugs on the pharmacy benefit, and each company separately managing certain relationships on the medical benefit and value-based contracting. Other relationships with members, caregivers and key stakeholders will also remain independent as they work to deliver better affordability and improved pharmacy care.

"As health care costs continue to grow at an unsustainable pace, improving the value we deliver in health care is critical. This collaboration will improve outcomes while still maintaining flexibility and transparency to the clients we proudly serve," said Ken Paulus, president and CEO, Prime.

"Our agreement reinforces our position as a health services partner of choice for health plans, employers, government and other payers seeking the most value for their investments in health care," said Tim Wentworth, president, Express Scripts. "This collaboration allows both Prime and Express Scripts to leverage our capabilities to deliver more affordable health care."

Express Scripts expects this relationship will have an immaterial impact to adjusted income from operations[1] in 2020 with a more positive contribution beginning in 2021.

[ Download ]

### About Prime Therapeutics

Prime Therapeutics LLC (Prime) makes healthcare work better by helping people get the medicine they need to feel better and live well. Prime provides total drug management solutions for health plans, employers, and government programs including Medicare and Medicaid. The company processes claims and offers clinical services for people with complex medical conditions. Prime serves more than 28 million people. It is collectively owned by 18 Blue Cross and Blue Shield Plans, subsidiaries or affiliates of those plans.

Follow @Prime_PBM on Twitter.

### About Express Scripts

Express Scripts is a health care opportunity company. Empowered by our legacy as an industry innovator, we dare to imagine — and deliver –– a better health care system with greater choice, predictability, affordability and improved outcomes. From pharmacy and medical benefits management, to specialty pharmacy care and

EXHIBIT 4

everything in between, we uncover opportunities to make health care better.

We stand alongside our clients and partners, collaborating to develop personalized solutions that make a meaningful difference in the lives of those we serve, whenever and wherever it's needed. We believe health care can do more. We are Champions For Better [SM]. Express Scripts, a Cigna company, unlocks new value in pharmacy, medical and beyond to further total health for all.

Sign-up for regular news announcements from Prime Therapeutics.

Contact

Karen Lyons
Director of Public Relations
Prime Therapeutics
612.777.5742
karen.lyons@primetherapeutics.com

Jennifer Luddy
Director, Media Relations
Cigna
908-794-9226
jennifer_luddy@express-scripts.com

Will McDowell
Vice President – Investor Relations
Cigna
215-761-4198
William.mcdowell2@cigna.com

**Notes:**

1. Adjusted income (loss) from operations is defined as shareholders' net income (loss) excluding the following adjustments: earnings contributions from transitioning pharmacy benefit management clients, Anthem Inc. and Coventry Health Care, Inc., net realized investment results, amortization of acquired intangible assets, and special items. Adjusted income (loss) from operations is measured on an after-tax basis for consolidated results and on a pre-tax basis for segment results.  Adjusted income (loss) from operations is a measure of profitability used by management because it presents the underlying results of operations of businesses and permits analysis of trends in underlying revenue, expenses and shareholders' net income. This consolidated measure is not determined in accordance with GAAP and should not be viewed as a substitute for the most directly comparable GAAP measure, shareholders' net income.

Cigna Corporation Cautionary Note Regarding Forward-Looking Statements

This press release, and oral statements made in connection with this release, may contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are based on our current expectations and projections about future trends, events and uncertainties. These statements are not historical facts.  Forward-looking statements may include, among others, statements concerning our projected adjusted income (loss) from operations outlook on a consolidated, per share, and segment basis; projected growth; projected adjusted pharmacy scripts; future financial or operating performance; future growth, business strategy, strategic or operational initiatives; and other statements regarding our future beliefs, expectations, plans, intentions, financial condition or performance. You may identify forward-looking statements by the use of words such as "believe," "expect," "plan," "intend," "anticipate," "estimate," "predict," "potential," "may," "should," "will" or other words or expressions of similar meaning, although not all forward-looking statements contain such terms.

Forward-looking statements are subject to risks and uncertainties, both known and unknown, that could cause actual results to differ materially from those expressed or implied in forward-looking statements. Such risks and uncertainties are discussed in our most recent report on Form 10-K and subsequent reports on Forms 10-Q and 8-K available on the Investor Relations section of www.cigna.com. You should not place undue reliance on forward-looking statements, which speak only as of the date they are made, are not guarantees of future performance or results, and are subject to risks, uncertainties and assumptions that are difficult to predict or quantify. We undertake no obligation to update or revise any forward-looking statement, whether as a result of new information, future events or otherwise, except as may be required by law.

We're here to help. You can get in touch with us by using our [contact form.](#)

© 2021 Prime Therapeutics LLC, All Rights Reserved.
[Privacy Policies](#) | [Terms of Use](#) | [Subrogation services](#)

[Thought leadership](#) | [Controlled substances](#)

**Our other websites**

[MyPrime.com](#)

[AllianceRx Walgreens Prime](#)

 [Linkedin](#)   [YouTube](#)   [Facebook](#)   [Twitter](#)




ACCREDITED

Pharmacy
Benefit
Management
Expires 01/01/2022









EXHIBIT 5

January 2, 2020



**Provider Communication**   **Prime Therapeutics and Express Scripts Collaboration**

Dear Valued Provider,

Prime Therapeutics LLC (Prime) continues our commitment to affordability and dedication to improved pharmacy care for our clients and their members. As part of our commitment, Prime has entered into a three-year, supply chain agreement with Express Scripts (ESI) to focus on enhancing pharmacy networks and pharmaceutical manufacturer value.

As part of this new collaboration, Prime's health plans will begin to transition to ESI's commercial and Medicaid pharmacy networks starting April 1, 2020. As part of the transition, there will be no changes to claims processing requirements, including BIN/PCNs.

Prime will continue to operate our claims processing platform, as well as manage and deliver a wide range of services to our clients and their members, including pharmacy network management, formulary management and clinical programs.

As a company, Prime is committed to evolving from a pharmacy benefit management company to a total drug management company that will allow our clients to propel in regional competitiveness. Our vision is to make health care work better by helping people get the medicine they need to feel better and live well. This step demonstrates our commitment to transforming our business into one that's focused on improving care, increasing value and leveraging pharmacy as a tool to deliver better health outcomes.

If you have any questions about this communication, please reach out to Prime at
PrimeContracting@primetherapeutics.com

If pharmacies have specific questions regarding their terms and conditions, including reimbursement with ESI, please have them contact their account team or RecontractingMailbox@express-scripts.com

Sincerely,
Prime Therapeutics LLC
Pharmacy Network Management

EXHIBIT 5

6811 © Prime Therapeutics LLC 02/19

EXHIBIT 6


PRIME
THERAPEUTICS*

| NRID | NRID Description Commercial, Exchange, State and Medicare Plans | Prime Exhibit Name |
|---|---|---|
| BAO | Access One Commercial | B-AO |
| BAOESN | Access One Commercial ESN | B-AO |
| BLESN | Broad Limited ESN | B-L ESN |
| B38 | Cambia Commercial | B-38 |
| B38ESN | Cambia Commercial ESN | B-38 ESN |
| B12A | Commercial ESN | B-12A |
| B12B | Commercial ESN (opt in) | B-12B |
| B12N | Commercial Narrow Retail | B-12N |
| B12NESN | Commercial Narrow ESN | B-12N |
| B11 | Commercial Preferred Elite | B-11 |
| B12L | Commercial Limited ESN | B-12L |
| B12P | Commercial Preferred ESN | B-12P |
| B16 | Commercial Vaccine | B-16 |
| DTE | Direct to Employer | DTE |
| BFL | FL Commercial | B-FL |
| BFLESN | FL Commercial ESN | B-FLESN |
| BEC | FL Exclusive Commercial | B-EC |
| BECESN | FL Exclusive Commercial ESN | B-EC |
| BFLM | FL Medicare | B-FLM |
| BFLMESN | FL Medicare ESN | B-FLM ESN |
| GPSPEC | GP Specialty Fee Schedule | GPSPEC |
| BHIV | HIV | B-HIV |
| BILHMO | IL HMO | B-IL HMO |
| ILHMO90 | IL HMO 90 | B-IL HMO 90 |
| BTX1H05 | Legacy TX HMO | B-TX1H05 |
| BL | Limited | B-L |
| LDD | Limited Distribution | LDD |
| BMC | Medicare Choice Retail | B-MC |
| BMCESN | Medicare Choice ESN | B-MC |
| B10HI | Medicare Home Infusion | B-10 |
| B7B | Medicare Hospital Pharmacy | B-7B |
| B9LTC | Medicare Long Term Care | B-9 |
| BMP | Medicare Preferred (any year) Retail | B-MP |
| BMPESN | Medicare Preferred (any year) ESN | B-MP |
| B1A | Medicare Retail | B-1A |
| B1B | Medicare Retail ESN | B-1B |
| BMS | Medicare Silver Retail | B-MS |
| BMSESN | Medicare Silver ESN | B-MS |
| B25 | Mississippi Instate Commercial | B-25 |
| B25ESN | Mississippi Instate Commercial ESN | B-25 |
| BNCCHOICE | NC Choice Instate Commercial Retail | B-NC CHOICE |
| BNCCHOICEE | NC Choice Instate Commercial ESN | B-NC CHOICE |
| B12NC | NC Instate Commercial ESN | B-12NC |

Prime Therapeutics LLC
Confidential

EXHIBIT 6

April 2020



| NRID | NRID Description Commercial, Exchange, State and Medicare Plans | Prime Exhibit Name |
|---|---|---|
| B34 | NC Instate Commercial | B-34 |
| BNJCHOICE | NJ Choice Commercial Retail | B-NJ CHOICE |
| BNJCHOICEE | NJ Choice Commercial ESN | B-NJ CHOICE |
| BNJ | NJ Instate Commercial Retail | B-NJ |
| BNJESN | NJ Instate Commercial ESN | B-NJ |
| BNJM | NJ Instate Med D Retail | B-NJM |
| BNJMESN | NJ Instate Med D ESN | B-NJM |
| BNJF | NJ Fertility | B-NJF |
| B32 | Oncology for NE | B-32 |
| B41 | RI Commercial | B-41 |
| B41ESN | RI Commercial ESN | B-41 ESN |
| B41RIM | RI Medicare Retail | B-41RIM |
| B41RIMESN | RI Medicare ESN | B-41RIM |
| B2D | Select Commercial | B-2D |
| BSPEC | Specialty Agreement & Fee Schedule | B-SPEC |
| B30 | Specialty Hemophilia/Bleeding Disorders | B-30 |
| BHIVQ | HIV QUALITY | B-HIVQ |
| CLIENT | Client Owned Contracts | B-WY |
| BNMCAID | New Mexico Medicaid | B-NMCAID |
| BPACHIP | CBC Chip Network | B-PACHIP |

| NRID | Commercial and Exchange Plans | Prime Processed Network Name |
|---|---|---|
| BIDBRODCBR | Broad | Schedule C |
| BIDBRODCBE | Broad ESN | EDS1 |
| BIDBRDPCCR | Broad Plus | Schedule A |
| BIDBRDPCCE | Broad Plus ESN | EDS1 |
| BIDBRDSCSR | Broad Select | Schedule B |
| BIDBRDSCSE | Broad Select ESN | EDS1 |
| BIDLMTDCLR | Limited | Schedule D |
| BIDLMTDCLE | Limited ESN | EDS2 |
| BIDPREFCPR | Preferred | Schedule EN15/20 |
| BIDPREFCPE | Preferred ESN | EDS2 |

| NRID | State Plans (Medicaid) | Prime Processed Network Name |
|---|---|---|
| BIDBRODSBR | Broad | Schedule C |
| BIDBRDPSCR | Broad Plus | Schedule A |
| BIDLMTDSLR | Limited | Schedule D |
| BIDPREFSPR | Preferred | Schedule EN15/20 |
| BIDBRDSSSR | Broad Select | Schedule B |

EXHIBIT 7



November 13, 2020

AHF Pharmacy Contracting
AIDS HEALTHCARE FOUNDATION
6255 W Sunset Blvd,
Floor 21
Los Angeles, CA 90028

**RE: Medicare Network Changes effective January 1, 2021**

Dear AHF Pharmacy:

Prime Therapeutics LLC (Prime) continues our commitment to affordability and dedication to improved pharmacy care for our clients and their members. As part of our commitment, Prime entered into a three-year network agreement with Express Scripts, Inc. (ESI) that gives Prime additional resources to focus on enhancing pharmacy network performance, including additional network options to our Benefit Sponsors.

ESI's Medicare network options are now available to Prime's Benefit Sponsors, and they have the choice to determine which pharmacy network(s) they will use to administer benefit plans. This letter serves as notice of Prime's Benefit Sponsors' network elections for Medicare networks starting January 1, 2021.

The following attachments are incorporated in this letter as notice to you of Benefit Sponsor elections:

1)  Attachment A: Benefit Sponsor Elections. This will provide your pharmacy with current network participation and Benefit Sponsor elections.
2)  Attachment B: Network Reimbursement ID (NRID). This will provide your pharmacy with the NRIDs pharmacy will see associated with Benefit Sponsor elections after January 1, 2021.

While ESI networks are contracted and managed by ESI, Prime will remain the claims processor for our Benefit Sponsors.

As part of claims processing, Prime provides a network identifier at the point of sale in the Reimbursement ID field (NCPDP field 545-2F). This Network Reimbursement ID (NRID)  can be used to link the new ESI networks back to the information contained in Attachments A and B. NRIDs are also available on Prime's website at: https://www.primetherapeutics.com/en/resources  If your pharmacy currently does not receive information in the Reimbursement ID field (NCPDP field 545-2F), please work with your claims software vendor to access this information.

Questions about this communication can be directed to Prime at: PharmacyOps@primetherapeutics.com

Specific questions regarding ESI's networks, contracts, including terms and conditions of participation, and reimbursement should be directed to ESI's network contracting team at: RecontractingMailbox@express-scripts.com

Sincerely,
Prime Therapeutics LLC
Pharmacy Network Management

EXHIBIT 7

4131-A3 MN  Prime Therapeutics LLC  02/19  06008739



**Attachment A: Current network participation and Benefit Sponsor Network Election**

| Current Network Election | Benefit Sponsor Utilization (Medicare) | Benefit Sponsor Network Election on or after 1/1/2021 |
|---|---|---|
| Exhibit B-1A | Arkansas Blue Cross and Blue Shield<br>Regence BlueShield of Idaho<br>Regence BlueCross BlueShield of Oregon<br>Regence BlueCross BlueShield of Utah<br>Regence BlueShield (WA)<br>Capital Blue Cross<br>Capital Health Plan, Inc.<br>Blue Cross and Blue Shield of Florida, Inc. (Florida Blue)<br>Blue Cross and Blue Shield of Illinios<br>Blue Cross and Blue Shield of Montana<br>Blue Cross and Blue Shield of New Mexico<br>Blue Cross and Blue Shield of Oklahoma<br>Blue Cross and Blue Shield of Texas<br>BCBSM, Inc. (BCBSMN)<br>Horizon Healthcare Services, Inc. (BCBSNJ)<br>Blue Cross & Blue Shield of Rhode Island<br>Vibra Healthcare, LLC | Schedule MEDD |
| Exhibit B-1B | Arkansas Blue Cross and Blue Shield<br>Regence BlueShield of Idaho<br>Regence BlueCross BlueShield of Oregon<br>Regence BlueCross BlueShield of Utah<br>Regence BlueShield (WA)<br>Capital Blue Cross<br>Capital Health Plan, Inc.<br>Blue Cross and Blue Shield of Florida, Inc. (Florida Blue)<br>Blue Cross and Blue Shield of Illinios<br>Blue Cross and Blue Shield of Montana<br>Blue Cross and Blue Shield of New Mexico<br>Blue Cross and Blue Shield of Oklahoma<br>Blue Cross and Blue Shield of Texas<br>BCBSM, Inc. (BCBSMN)<br>Horizon Healthcare Services, Inc. (BCBSNJ)<br>Blue Cross & Blue Shield of Rhode Island<br>Vibra Healthcare, LLC | Schedule MEDD/EDS1 |
| Exhibit B-FLM | Capital Health Plan, Inc.<br>Blue Cross and Blue Shield of Florida, Inc. (Florida Blue) | Schedule MEDD |
| Exhibit B-FLM ESN | Capital Health Plan, Inc.<br>Blue Cross and Blue Shield of Florida, Inc. (Florida Blue) | Schedule MEDD/EDS1 |
| Exhibit B-MC | Blue Cross and Blue Shield of Alabama<br>Arkansas Blue Cross and Blue Shield<br>Experience Health (BCBSNC)<br>Blue Cross and Blue Shield of Florida, Inc. (Florida Blue) | Medicare Part D Performance Network |

2900 Ames Crossing Road, Eagan, MN 55121 | T: 612.777.4000 | 800.858.0723

4131-A3 MII  Prime Therapeutics LLC  02/19  06008739



| | | |
|---|---|---|
| | Blue Cross and Blue Shield of Oklahoma<br>BCBSM, Inc. (BCBSMN)<br>Horizon Healthcare Services, Inc. (BCBSNJ) | |
| Exhibit B-MS | Blue Cross and Blue Shield of Alabama<br>Alignment Healthcare USA, LLC<br>Regence BlueShield of Idaho<br>Regence BlueCross BlueShield of Oregon<br>Regence BlueCross BlueShield of Utah<br>Regence BlueShield (WA)<br>Capital Blue Cross<br>Capital Health Plan, Inc.<br>Blue Cross and Blue Shield of Florida, Inc. (Florida Blue)<br>Blue Cross and Blue Shield of Kansas Inc.<br>Blue Cross and Blue Shield of Nebraska, Inc.<br>Blue Cross and Blue Shield of Illinios<br>Blue Cross and Blue Shield of New Mexico<br>Blue Cross and Blue Shield of Oklahoma<br>Blue Cross and Blue Shield of Texas<br>BCBSM, Inc. (BCBSMN)<br>Blue Cross and Blue Shield of North Carolina | Schedule MEDD<br>(Amended) |

2900 Ames Crossing Road, Eagan, MN 55121 | T: 612.777.4000 | 800.858.0723

4131-A3 MN  Prime Therapeutics LLC  02/19  06008739



**Attachment B: Network Reimbursement ID (NRID):**

**Medicare NRIDs:**

| Prime Processing NRID* | Network Name | Day Supply |
|---|---|---|
| BIDOPENMOR | Schedule MEDD | RETAIL |
| BIDOPENMOE | Schedule MEDD/EDS1 | ESN |
| BIDSILVMSR | Schedule MEDD (Amended) | RETAIL |
| BIDSILVMSE | Schedule MEDD (Amended) | ESN |
| BIDLIMTMLR | Medicare Part D Performance Network | RETAIL |
| BIDLIMTMLE | Medicare Part D Performance Network | ESN |
| BIDPREFMPR | Medicare Part D Preferred Performance Network | RETAIL |
| BIDPREFMPE | Medicare Part D Preferred Performance Network | ESN |
| BIDPREFMDR | Medicare Part D Preferred Performance Network | RETAIL |
| BIDPREFMDE | Medicare Part D Preferred Performance Network | ESN |
| BIDPREFMER | Medicare Part D Premier Preferred Performance Network | RETAIL |
| BIDPREFMEE | Medicare Part D Premier Preferred Performance Network | ESN |
| BIDLTCMTR | Medicare Long Term Care | RETAIL |

* The ESI Network NRIDs are current as of the date of this letter and are subject to change. Please visit Prime's website for updated NRIDs: www.primetherapeutics.com

EXHIBIT 8

# Express Scripts + Prime Therapeutics: Our Four Takeaways From This Market Changing Deal

drugchannels.net/2020/01/express-scripts-prime-therapeutics-our.html

 **DRUG CHANNELS**
Expert Insights on Pharmaceutical Economics
and the Drug Distribution System

  



Just before the holidays, Cigna's Express Scripts business announced a market-changing deal with Prime Therapeutics. Click here to read the press release.

There's been very little written about this transaction, though it has potentially major implications. Below, I share my thoughts on the following topics arising from the deal:

Implications for manufacturers and pharmacies

The role of the secretive Ascent Health Services

What this all means for Walgreens

Why the Federal Trade Commission won't challenge the deal

A few weeks ago, I explained why integrated insurer / PBM / specialty pharmacy / provider organizations are poised to restructure U.S. drug channels. The Express Scripts / Prime deal signals that the channel will continue its amazing pace of reinvention.

The scale, scope, and interconnectedness of today's market participants make the system increasingly resistant to massive disruption from either external players like Amazon or a government takeover. Like it or not, the channel will continue to gain power and extract profit. Read on and see if you agree.

**DEAL DETAILS**

EXHIBIT 8

For additional background for today's post, I spoke with Tim Wentworth, CEO of Express Scripts, and Jarrod Henshaw, Prime's Senior Vice President, Chief Supply Chain and Industry Relations Officer. The opinions and interpretations below, however, are my own.

Here's a brief summary of the new relationship between Express Scripts and Prime Therapeutics.

- Express Scripts will handle:
    - Rebate negotiations with manufacturers of drugs covered under the pharmacy benefit
    - Retail pharmacy network contracting for the majority of Prime's business

- Each company will independently manage:
    - Enrollment and member services for beneficiaries of their respective plans
    - Formulary development
    - Formulary and rebate negotiations with manufacturers of drugs covered under the medical benefit
    - Custom network options
    - Value based care strategies and contracting

The press release carefully refers to the deal as a collaboration rather than as an alliance, acquisition, or merger. The release further states that "Express Scripts will provide services to Prime" and that "both companies will continue to work independently with pharmaceutical manufacturers." That wording highlights the theoretically temporary nature of the relationship.

This structure means that Prime's customers will not automatically default to the Express Scripts' formularies and pharmacy networks. Executives from both companies stressed to me that Express Scripts will customize its services to Prime's individual plan clients.

**IMPLICATIONS**

Here are four observations and takeaways from this new arrangement:

**1. Manufacturers and pharmacies will face the biggest PBM ever.**

By adding the Prime volume, Express Scripts will be leading rebate negotiations and pharmacy network development for 103 million people. This combined volume of Express Scripts and Prime will have enormous leverage with manufacturers and pharmacies.

The chart below shows national market shares for the largest PBMs in 2018. As you can see, about three-quarters of all equivalent prescription claims were processed by three companies: CVS Health (including Caremark and Aetna), Express Scripts, and the OptumRx

business of UnitedHealth. FYI, these data appear in Section 5.2. of our _2019 Economic Report on U.S. Pharmacies and Pharmacy Benefit Managers._ Our updated data and market analyses will appear in the forthcoming 2020 edition, which will be available on March 10.

[Click to Enlarge]



This concentration helps plan sponsors and payers, who can maximize their negotiating leverage by combining their prescription volumes within a small number of PBMs. However, the ever-growing concentration of buying power will remain controversial—especially for the drugmakers and pharmacies that will be on the receiving end of Express Scripts' new scale.

Consider that five of the largest pharmaceutical manufacturers—Eli Lilly, Janssen, Merck, Novartis, and Sanofi—already discount their drugs' list prices by about 50%. (See Half-Off Sale! Five Major Drugmakers Reveal Vast Gross-to-Net Price Gaps—and Why Rebate Reform Is Still Needed.) I've also highlighted the profit pressures facing retail pharmacies in multiple articles and reports, such as The State of Retail Pharmacy: Independent Pharmacy Economics Stabilize—But Dropping, Owner Salaries Are.

**2. The Ascent Health Services GPO plays a crucial role in this collaboration—and possibly limits plan sponsor transparency into the deal's underlying economics.**

Here's one important angle that was not mentioned in the press release: Prime will source formulary rebates via Ascent Health Services, the secretive Switzerland-based group purchasing organization (GPO) that Express Scripts launched in 2019.

There are at least two apparent motivations for this move:

Tax efficiency due to transfer pricing and rebate accounting using Switzerland's lower corporate tax rate

Express Scripts (as Ascent) will be able to collect GPO admin fees

The second motive also implies a possible hedge against reform of PBM pricing practices.

Multiple regulatory and legislative proposals would prohibit manufacturers from paying PBMs administrative service fees ("admin fees") that are based on a percentage of sales or drug list prices.

However, there is no parallel effort to alter GPO safe harbor rules. Today, GPOs are compensated via manufacturer-paid administrative fees that are typically computed as a percentage of the purchase price that the healthcare provider pays for a product bought through a GPO contract. A GPO works on behalf of its members. By aggregating the purchasing volume of its members, a GPO lowers its members' cost of goods and reduces in-house contracting functions.

It seems as if Ascent is acting as a rebate aggregator for the combined formulary volume of Express Scripts and Prime Therapeutics. The members of the Ascent GPO can then structure their own contracts and arrangements with their respective plan sponsor clients.

Executives at both Express Scripts and Prime emphasized to me that Ascent provides significant transparency to its PBM members. However, I'm still not clear on how much transparency the plan sponsor clients of each PBM have into Ascent's operations. Inserting another intermediary in the drug channel always adds transparency, right?

**3. This transaction poses fresh challenges for Walgreens Boots Alliance.**

The deal heightens the headwinds facing Walgreens Boots Alliance's (WBA) U.S. pharmacy business.

In 2017, WBA and Prime Therapeutics completed the formation of AllianceRx Walgreens Prime. It is the exclusive mail and specialty pharmacy for Prime Therapeutics' PBM beneficiaries, and is also able to contract with (and dispense for) other PBMs and plans. Legally, the business is a subsidiary of WBA, so its financials are included within WBA's broader financial reporting. WBA does not report separate revenues for the business, so the revenue figure in our list of the largest 15 specialty pharmacies reflects Drug Channels institute estimates.

It's not clear that the Prime deal has ever lived up to its promise for Walgreens. Prime Therapeutics has grown more slowly than its larger peers, which has meant less incremental growth for Walgreens. In addition, I perceive that Prime's Blue Cross and Blue Shield clients

have been less aggressive in using limited and exclusive pharmacy networks for specialty drugs.

Consequently, AllianceRx Walgreens Prime didn't get the same boost that other PBM-owned specialty pharmacies have received. And for its non-Prime business, AllianceRx Walgreens Prime ended up in a position similar to that of other independent specialty pharmacies. The super-profitable 340B contract pharmacy business has essentially saved Walgreens pharmacy. See Here's How PBMs and Specialty Pharmacies Snag Super-Size Profits from the 340B Program .

Walgreens is also the core participant in Prime's national preferred pharmacy network. This arrangement includes all types of retail prescriptions—generic, brand-name, 30-day, 90-day, etc. Will it now face lower retail profits once Express Scripts starts managing pharmacy network reimbursement for Prime?

Prime's Jarrod Henshaw offered me only a "no comment" when I asked about the future of AllianceRx Walgreens Prime.

Another question to ponder: Will Prime buy generics with Express Scripts?

Express Scripts has partnered with Walgreens Boots Alliance Development (WBAD) to purchase generic drugs. Express is participating via its Innovative Product Alignment (IPA) subsidiary. Prime acquires generics though its WBA pharmacy relationship. (See Section 2.3.3. of our *2019–20 Economic Report on Pharmaceutical Wholesalers and Specialty Distributors*.) Alas, neither Prime nor Express Scripts executives were willing to say what their new deal might mean for IPA or WBAD.

Does all of this mean that the Walgreens-Prime relationship will fall apart? Or that Cigna will co-invest with private equity in a leveraged buyout of—or acquire the U.S. pharmacy business of—WBA?

Hmm. Perhaps WBA's management will deign to address these topics on tomorrow's earnings call—but I doubt it.

**4. The FTC is unlikely to intervene in the arrangement.**

The Federal Trade Commission (FTC) will probably consider the Express Scripts-Prime deal to be pro-competitive. That's because the FTC will likely determine that the arrangement lowers healthcare costs and will therefore be beneficial to consumers.

Here's why: The relationship between a PBM and pharmacies or manufacturers can best be described as an **oligopsony—a** market with many sellers but few buyers. Pharmacies and manufacturers are not really customers of a PBM in the context of the drug supply chain.

They are sellers of goods (manufacturers) or dispensing services (pharmacies) that a PBM use to create its benefit management service.

For context, you may want to revisit the FTC's decision in the Express Scripts-Medco Health Solutions merger. I reviewed it in 2012's ESRX-MHS: Analysis of the FTC Decision.

What's more, Express Scripts and Prime are collaborating for only three years. If the FTC challenged the arrangement, the companies would argue that the collaboration could be unwound if any anti-competitive issues emerged. Therefore, they would argue that the appropriate remedy will be to evaluate the marketplace results rather than block the market's evolution.

I know that many readers will be disappointed with my take. Feel free to leave your own thoughts in the comments below.

## WHAT'S NEXT?

Can Prime remain independent?

The Express Scripts deals preserves the company's options and flexibility. However, it also creates a logical pathway for being acquired or absorbed into Cigna.

Today, Prime operates as a pass-through PBM for the 18 Blue Cross and Blue Shield health plans that have ownership stakes in the business. Prime also provides PBM services for five additional plans and direct employer groups. It handles benefits for more than 28 million people. Prime's management believes that the Express Scripts deal will allow it to become more competitive and therefore add more customers.

Express Scripts also services many Blues plans—and presumably also seeks new business.

When asked about potential conflicts over new customers, Express Scripts CEO Tim Wentworth told me that his company would be "biased toward helping Prime win business with new Blues plans." This sentiment is consistent with the nature of the services agreement with Prime.

I suspect that we will look back on the Prime's strategic shift as another move toward vertical consolidation and the disappearance of the PBM industry as we have known it. Underway, the PBM endgame is.